**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

VIEJAS BAND OF KUMEYAAY INDIANS     :
         :
         Plaintiff,          :     Civil Action
         :     No.
         v.          :
         :
JAY LORINSKY and FIRST NATIONS     :
FINANCIAL SERVICES, INC.          :
         :
         Defendants.          :     DECEMBER 9, 2003

<u>COMPLAINT</u>

1.     Plaintiff Viejas Band of Kumeyaay Indians ("the Tribe") is a federally recognized Indian Tribe, which is located in and around Alpine, California.

2.     Defendant Jay Lorinsky is an individual residing in Norwich, Connecticut.

3.     Defendant First Nations Financial Services, Inc. ("First Nations") is a Connecticut corporation with its principal place of business in Norwich, Connecticut. Lorinsky is the Senior Vice President of First Nations.

4.     The amount in dispute exceeds $75,000.

5.     Jurisdiction exists for this action based on diversity of citizenship, 28 U.S.C. § 1332(a).

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a).

7.     From approximately August 1998 until on or about August 15, 2002, Lorinsky and First Nations were responsible for procuring and maintaining medical, dental, vision, and life insurance as well as retirement program and 401K plans for the Tribe and for Viejas Enterprises (consisting of the Tribal Government Center, Viejas Casino and Turf Club and the Viejas Outlet Center ("Enterprises")), which is owned and operated by the Tribe.

8.     Each of the insurance policies relevant to the Complaint were issued by The Hartford.

9.     As neither the Tribe nor the Enterprises had any employee knowledgeable on insurance issues, the Tribe relied upon Lorinsky and First Nations' expertise in deciding the appropriate type and levels of insurance to purchase.   Lorinsky and First Nations understood that the Tribe was relying upon them to advise and assist the Tribe in making appropriate decisions with respect to the type and level of insurance to purchase.

10.     The Tribe trusted that Lorinsky and First Nations were advising the Tribe appropriately and making appropriate decisions on its behalf.

11.     The Tribe is governed by a Tribal Council.   During a Tribal Council request for proposal process in which Lorinsky and First Nations were trying to retain their status as the Tribe's and Enterprises insurance brokers, the Tribal Council expressed concern that Lorinsky could not adequately represent them from Connecticut.   Lorinsky represented that he would relocate to the San Diego area to service the Tribe and Enterprises.

12.     Although Lorinsky and First Nations were retained as a result of that request for proposal process, Lorinsky never relocated.

13.     Lorinsky previously verbally promised that he had "locked in" the Tribe's premiums on its Hartford life insurance policies and that those premiums would not increase for two years.

14.     On the basis of Lorinsky's representations, the Tribal Council decided to keep Lorinsky and First Nations as its insurance brokers.

15.     At all times, The Hartford billed First Nations for the Tribe's life insurance policies.  First Nations generated its own invoices and sent those to the Tribe on First Nations letterhead.  The Tribe in turn paid The Hartford directly based on the invoices that it received from First Nations.

16.     The Tribe had no direct contact with The Hartford other than to send The Hartford premium checks.

17.     The Tribe also paid Lorinsky and First Nations separate flat fees for their brokerage services.  Upon information and belief, Lorinsky and First Nations also received commissions from The Hartford for each policy that Lorinsky and First Nations sold to the Tribe and Enterprises.

THE TRIBE'S LIFE INSURANCE POLICY

18.     In a letter dated March 28, 2001, addressed to "Mr. Jay Lorinsky Viejas Band of Kumeyaay Indians c/o First Nations Financial," The Hartford informed Lorinsky that premiums on the Tribe's life group life insurance policy, Policy No. GL-50000, would

increase, effective May 1, 2001.  In this letter, The Hartford specifically requested that Lorinsky "deliver this renewal information" to the Tribe.  The Hartford wanted Lorinsky to notify the Tribe because "the May 1 billing statement [would] reflect the new rates" and the Hartford would "not notify them directly."

19.    Lorinsky did not forward this letter to the Tribe, nor did he notify the Tribe of this increase in premiums.  Indeed, he and First Nations continued to invoice the Tribe based on the former premium rate.

20.    As a result, starting in May 2001, after the new premiums took effect, the Tribe consistently underpaid its life insurance premiums, unaware of the increase.

21.    In a letter dated August 16, 2001, addressed to "Jay Lorinsky Viejas Band of Kumeyaay Indians c/o First Nations Financial," The Hartford advised Lorinsky that it had found "an underpayment resulting from the rate change effective May 1, 2001," in the amount of $10,480.20.  Lorinsky did not advise the Tribe about the underpayment, nor did he advise The Tribe about this letter.

22.    In a letter dated October 26, 2001, addressed to "Jay Lorinsky Viejas Band of Kumeyaay Indians c/o First Nations Financial," The Hartford advised Lorinsky that a review of the life insurance policy account indicated an "underpayment due to a rate increase effective May 1."  The Hartford requested payment by November 1, 2001. Lorinsky did not advise the Tribe about the letter dated October 26, 2001 or the underpayment discussed therein.

23.     In a letter dated December 13, 2001 and addressed to Anita Uqualla, "Tribal Treasurer," The Hartford advised that the Tribe had underpaid its premiums and that as a result, the life insurance policy had "been lapsed as of 10/1/01."

24.     Ms. Uqualla had retired as Tribal Treasurer in or about November 2000. The Hartford copied Lorinsky on its December 13, 2001 letter to Ms. Uqualla.  Upon information and belief, Lorinsky knew that Ms. Uqualla no longer served in this capacity for the Tribe, but he did not contact anyone at the Tribe regarding this letter or the lapse of the life insurance policy, nor, upon information and belief, did he advise The Hartford that it had sent the letter concerning cancellation to a person he knew no longer worked for the Tribe.

25.     By January 2002, the underpayment of premiums to The Hartford on the life insurance policy was $25,021.65.

26.     Meanwhile, Lorinsky persuaded the Tribe to switch its life insurance coverage from The Hartford to Unum, effective February 1, 2002.

27.     In a letter dated January 11, 2002, Lorinsky wrote to Erich Hans, Director of Finance for the Tribe, to advise him that the Tribe's aggregate stop loss policy for health insurance could be renewed for an annual premium of $25,000.  Lorinsky faxed this letter to Mr. Hans, and the Tribe issued a check in the amount of $25,000 to The Hartford that same day.

28.     On information and belief, on or about February 13, 2002, Lorinsky participated in a conference call with representatives of The Hartford in which he told them

to take the premium payment of $25,000 that the Tribe had sent for its health insurance aggregate stop loss policy and to apply it instead to the underpayment of premiums on the life insurance policy.

29.    In a letter dated February 27, 2002, The Hartford again wrote to Anita Uqualla, who was no longer the Tribal treasurer.  In this letter, The Hartford advised that as a result of the Tribe's underpayment of premiums on its life insurance, by January 2002, the full amount of underpayment totaled $25,021.65.   In this letter the Hartford further advised that on January 15, 2002, it had received a check in the amount of $25,000 and that per Lorinsky's instruction in a conference call of February 13, 2002, it applied this check to the underpayment of life insurance premiums.

30.    The Hartford copied Lorinsky on its February 27, 2002 letter to Ms. Uqualla.  Upon information and belief, Lorinsky knew that Ms. Uqualla no longer held the position of Treasurer, but he did not contact anyone at the Tribe regarding this letter.  He did not advise the Tribe that he instructed The Hartford during the February 13, 2002 conference call to apply the $25,000 intended for the health insurance aggregate stop loss policy to the life insurance policy premium underpayment.

<u>THE TRIBE'S HEALTH INSURANCE</u>

31.    The Tribe's health insurance program consisted of both an aggregate stop loss policy no. 506507 for the Tribe and an individual stop loss policy no. 506010 for its members.

32.    As set forth above, Lorinsky invoiced the Tribe $25,000 for a premium for its aggregate stop loss coverage.  Unbeknownst to the Tribe, The Hartford's actual annual premium for the aggregate stop loss coverage was $10,500 plus a $234.90 monthly accounting.

33.    In an e-mail dated March 20, 2002, The Hartford advised Lorinsky that the aggregate stop-loss policy had been cancelled as of January 1, 2002 due to nonpayment. The letter further advised that "[i]n order for reinstatement to occur, [the Hartford] need[ed] $10,734.90 sent [ ] via overnight ASAP."

34.    Upon information and belief, Lorinsky did not provide that $10,734.90 payment, which would have been the aggregate stop loss annual premium plus a monthly accounting, nor did he notify the Tribe of the need for this payment to reinstate the policy.

35.    Lorinsky did not tell anyone at the Tribe that the aggregate stop loss policy had been cancelled.

36.    The aggregate stop loss policy is intended to provide coverage when annual aggregate attachment points are exceeded.

37.    Upon information and belief, Lorinsky knew that it was probable that the annual aggregate attachment points would be exceeded during the course of the 2002 plan year and that there would no longer be any aggregate stop loss coverage available to cover the difference.

38.    Upon information and belief, Lorinsky persuaded the third-party administrator, Plan Handlers, Inc., to slow down the payment of health claims for the

express purpose of preventing the Tribe from discovering that the aggregate stop loss policy was no longer in effect.

39.    On or about July 30, 2002, The Hartford signed and sent out an Amendatory Rider to the aggregate stop loss policy that informed the Tribe that that policy had been cancelled.  Upon receiving this, the Tribe learned for the first time that its aggregate stop loss coverage had been cancelled.

40.    When the Tribe uncovered Lorinsky and First Nations' actions and omissions, the Tribe terminated their services by letter dated August 15, 2002.

41.    Also on or about August 15, 2002, the Tribe retained Marsh Risk & Insurance Services ("Marsh") as its replacement broker.

42.    Immediately upon retaining Marsh, the Tribe directed Marsh to reinstate the aggregate stop loss coverage.

43.    Marsh was able to reinstate the aggregate stop loss coverage, but because the policy had been allowed to lapse, The Hartford required the reinstatement to be at new, significantly higher attachment factors.

44.    The attachment factors that would have applied if the original policy Lorinsky and First Nations were directed to renew had continued in place would have been $301.43 for single people and $783.72 for families.  The attachment factors for the reinstated policy were $564.56 for single people and $1,467.86 for families.

45.    The Hartford required the higher attachment factors because the original renewal attachment factors were based upon erroneous claims payment information from

Plan Handlers, Inc.  By the time of the reinstatement, The Hartford had access to claims payment information that suggested that the higher attachment factors were appropriate.

46.    As a result of Lorinsky's cancellation of the aggregate stop loss policy, the Tribe had to pay claims out of its own funds that exceeded the original attachment factors. Specifically, the original cumulative attachment factors were $1,321,351.36.  The total paid claims for 2002 were $1,488,554.26.  This resulted in a payment of $167,202.90 by the Tribe that would not have been required if the aggregate stop loss policy had stayed in effect.

THE ENTERPRISES' HEALTH INSURANCE

47.    The Enterprises also retained Lorinsky and First Nations to procure insurance for the Enterprises' employees.  At the time relevant to this Complaint, the Enterprises had approximately 1800 employees who were enrolled in its health insurance program.

48.    In or about October 2000, Lorinsky persuaded a panel of representatives of the Tribal Council and internal management that the Enterprises should move from a premium-based health insurance plan with Pacificare to a self-funded aggregate stop loss and individual stop loss program with The Hartford and should use his broker services.

49.    Lorinsky proposed a composite aggregate attachment factor of 206.18. Based on this proposal, the panel agreed to keep Lorinsky and First Nations as broker of record.  Based on the number of single and family participants in the plan, the coverage

Lorinsky proposed would have resulted in a cumulative aggregate attachment of $4,580,701.06.

50.     The Enterprises' payment program operated differently than did the Tribe's program.  Plan Handlers, the third party administrator, paid all of the administrative fees from a fund funded by the Enterprises.  Plan Handlers cut checks for administrative fees that included $342,156.03 in payments to The Hartford.  The Enterprises understood that this was all that was required to be paid to The Hartford, including premiums for its aggregate stop loss coverage for the period of September 1, 2001 through August 31, 2002.

51.     Unbeknownst to the Tribe, Lorinsky and First Nations never procured aggregate stop loss coverage for the Enterprises and its employees.

52.     The Tribe also sustained damages from misrepresentations about the Enterprises' individual stop loss coverage.

53.     As recently as May 30, 2002, Lorinsky faxed materials to Jeff Warner of the Enterprises that implied that the aggregate stop loss coverage was in place.  Moreover, on July 22, 2002, Denyce Cooper of Plan Handlers wrote to the Enterprises' Human Resources Director with a status report on the aggregate stop loss coverage.

54.     However, on July 10, 2002, Lorinsky conceded that there "was never an offer on the table" and that there was no aggregate stop loss insurance in place for the Enterprises employees.

55.     If the aggregate stop loss policy had been procured at a composite attachment factor of 206.18 for a cumulative aggregate attachment of $4,580,701.06, the

Enterprises would have been eligible to receive aggregate stop loss reimbursement from The Hartford for $1,169,625.98 of the $5,750,327.04 in claims that it actually paid for the September 1, 2001 – August 31, 2002 period. The Tribe has been damaged in the amount of $1,169,625.98.

56.     The Tribe also sustained damages from misrepresentations about the Enterprises' individual stop loss coverage. In the late Spring or Summer 2001, Lorinsky hosted open enrollment meetings about The Hartford program for the Enterprises and its employees. During those meetings, at least one employee asked whether a specific procedure was covered, and Lorinsky represented that it was.

57.     At least two other employees had been negotiating with Pacificare about treatment for pre-existing conditions. Lorinsky represented that these treatments also would be covered by The Hartford.

58.     In reliance on these representations, the three employees went through with the procedures and submitted claims to The Hartford.

59.     Ultimately, The Hartford declined to cover these procedures for reasons that were stated in the policies and that Lorinsky should have known.

60.     The Enterprises paid for these procedures.

61.     When all of the problems with the health and life insurance policies came to light in August 2002, the Tribe spent significant time and money investigating and rectifying the situation.

62.     With regard to all of the acts and omissions described above, Lorinsky and First Nations acted with reckless indifference to or an intentional and wanton violation of the rights of the Tribe, the Enterprises and their employees and families.

63.     With regard to all of the acts and omissions described above, Lorinsky and First Nations engaged in a continuing course of conduct that tolls any applicable statute of limitations.

## COUNT ONE:  BREACH OF FIDUCIARY DUTY AGAINST LORINSKY AND FIRST NATIONS

64.     The Tribe incorporates Paragraphs 1-63 as Paragraph 64 of Count One.

65.     Lorinsky and First Nations possessed superior knowledge on insurance issues and understood the Tribe was relying upon them with regard to the procurement and maintenance of life and health insurance.

66.     The Tribe had no knowledge of relevant insurance issues and trusted that Lorinsky and First Nations would represent its interests in procuring and maintaining appropriate and adequate insurance.

67.     As the Tribe's brokers, Lorinsky and First Nations owed it a duty to represent the Tribe's interests vis-à-vis The Hartford and the Tribe trusted them to do so.

68.     Lorinsky and First Nations were fiduciaries.

69.    Lorinsky and First Nations owed duties to the Tribe to exercise reasonable care and diligence in procuring all of the insurance the Tribe and the Enterprises had requested and in paying the full premiums on a timely basis to maintain that insurance.

70.    Lorinsky and First Nations breached those duties.

71.    Lorinsky and First Nations' breaches of those duties caused harm to the Tribe.

COUNT TWO:  NEGLIGENCE AGAINST LORINSKY AND FIRST NATIONS

72.    The Tribe incorporates Paragraphs 1-63 as Paragraph 72 of Count Two.

73.    Lorinsky and First Nations owed duties to the Tribe to exercise reasonable care and diligence in procuring the insurance that the Tribe and the Enterprises had requested and in maintaining such insurance by paying the full premiums on a timely basis.

74.    Lorinsky and First Nations owed the Tribe a duty to exercise reasonable care, skill and diligence in keeping it informed of any significant notices from The Hartford, including but not limited to notices about nonpayment of premiums or cancellation.

75.    Lorinsky and First Nations breached their duties.

76.    Lorinsky and First Nations' breaches of those duties caused harm to the Tribe.

## COUNT THREE:  NEGLIGENT MISREPRESENTATION AGAINST LORINSKY AND FIRST NATIONS

77.    The Tribe incorporates Paragraphs 1-63 as Paragraph 77 of Count Three.

78.    Lorinsky and First Nations represented to the Tribe that, among other things,

   a.   the premiums for The Hartford life insurance policies were "locked in" and would not increase for two years;

   b.   the premiums for the 2002 life insurance policy were the same as for the previous year when in fact they had increased;

   c.   the aggregate stop loss premium for the Tribe was $25,000 when in fact it was $10,500;

   d.   they would procure aggregate stop loss coverage for the Enterprises employees for September 1, 2001 through August 31, 2002; and

   e.   certain Enterprises employees would be covered by The Hartford for certain medical procedures.

79.    Lorinsky and First Nations should have known that these representations were not true when they made them.

80.    Lorinsky and First Nations had a duty to inform and omitted to inform the Tribe that, among other things,

   a.   Lorinsky had received numerous notices from The Hartford about the underpayment of premiums;

    b.  Lorinsky had instructed The Hartford to apply the $25,000 the Tribe had paid for aggregate stop loss coverage to pay overdue or delinquent payments of life insurance premiums;

    c.  Lorinsky had cancelled the 2002 aggregate stop loss coverage for the Tribe;

    d.  Lorinsky had received numerous notices from The Hartford offering reinstatement of the Tribe's aggregate stop loss coverage;

    e.  Lorinsky had instructed Plan Handlers to slow down the payment of claims as a means to delay or prevent discovery of the cancellation of the Tribe's aggregate stop loss coverage; and

    f.  Lorinsky and First Nations failed to procure aggregate stop loss coverage for the Enterprises.

81.    The Tribe reasonably relied to its detriment on Lorinsky and First Nations' representations and omissions.

82.    As a result of the Tribe's reliance on these representations and omissions, it suffered significant monetary losses.

## COUNT FOUR:  FRAUD AGAINST LORINSKY AND FIRST NATIONS

83.    The Tribe incorporates Paragraphs 1-63 as Paragraph 83 of Count Four.

84.    Lorinsky and First Nations represented to the Tribe that, among other things,

a.   the premiums for The Hartford life insurance policies were "locked in" and would not increase for two years;

b.   the premiums for the 2002 life insurance policy were the same as for the previous year when in fact they had increased;

c.   the aggregate stop loss premium for the Tribe was $25,000 when in fact it was $10,500;

d.   they would procure aggregate stop loss coverage for the Enterprises employees for September 1, 2001 through August 31, 2002; and

e.   certain Enterprises employees would be covered by The Hartford for certain medical procedures.

85.   Lorinsky and First Nations knew that these representations were not true when he made them.

86.   Lorinsky and First Nations failed to inform the Tribe of the following material facts:

a.   Lorinsky had received numerous notices from The Hartford about the underpayment of premiums;

b.   Lorinsky had instructed The Hartford to apply the $25,000 the Tribe had paid for aggregate stop loss coverage to pay overdue or delinquent payments of life insurance premiums;

c.   Lorinsky had cancelled the 2002 aggregate stop loss coverage for the Tribe;

    d.  Lorinsky had received numerous notices from The Hartford offering reinstatement of the Tribe's aggregate stop loss coverage;

    e.  Lorinsky had instructed Plan Handlers to slow down the payment of claims to delay or prevent discovery of the cancellation of the Tribe's aggregate stop loss coverage; and

    f.  Lorinsky and First Nations failed to procure aggregate stop loss coverage for the Enterprises.

87.    Lorinsky and First Nations made these representations and failed to inform the Tribe of the above material facts in order to induce the Tribe to continue to procure and rely upon their services.

88.    The Tribe reasonably relied to its detriment on Lorinsky and First Nations' representations and omissions.

89.    As a result of the Tribe's reliance on these representations and omissions, it suffered significant monetary losses.

## COUNT FIVE:  BREACH OF CONTRACT AGAINST FIRST NATIONS

90.    The Tribe incorporates Paragraphs 1-63 as Paragraph 90 of Count Five.

91.    The Tribe contracted with First Nations to serve as its insurance broker to procure and maintain its insurance.

92.     First Nations breached that contract by failing to maintain the Tribe's aggregate stop loss policy and by failing to procure the Enterprises' aggregate stop loss policy.

93.     First Nations' breaches of this contract caused injury to the Tribe.

## COUNT SIX:  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST FIRST NATIONS

94.     The Tribe incorporates Paragraphs 1-63 as Paragraph 94 of Count Six.

95.     There is a covenant of good faith and fair dealing implied in every contract that requires that neither party do anything that could impair the right of the other party to receive the benefits of the contract.

96.     First Nations had an obligation to exercise good faith in fulfilling its brokerage contract with the Tribe.

97.     First Nations intended to mislead or deceive the Tribe about the Tribe's life and health insurance and the Enterprises' health insurance, or First Nations neglected to fulfill its contractual duties as to the Tribe's life and health insurance and the Enterprises' health insurance, which neglect was not based on an honest mistake.

98.     First Nations' breach of the covenant of good faith and fair dealing has injured the Tribe.

COUNT SEVEN:  VIOLATIONS OF THE CONNECTICUT UNFAIR INSURANCE
PRACTICES ACT AND THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
AGAINST LORINSKY AND FIRST NATIONS

99.     The Tribe incorporates Paragraphs 1-63 and Paragraphs 84-89 as Paragraph 99 of Count Seven.

100.     Lorinsky and First Nations are each "persons" as defined in Conn. Gen. Stat. § 42-110a.

101.     At all times relevant herein, Lorinsky and First Nations were engaged in trade or commerce.

102.     Lorinsky and First Nations knowingly misrepresented the benefits, advantages, conditions and terms of policies it sold to the Tribe in violation of Conn. Gen. Stat. § 38a-816(1)(a).

103.     Lorinsky and First Nations also made misrepresentations for the purpose of inducing or intending to induce the lapse or the forfeiture of the Tribe's insurance policies in violation of Conn. Gen. Stat. § 38a-816(1)(f).

104.     Lorinsky and First Nations made these misrepresentations in the course of soliciting the Tribe's business in order to entice the Tribe to continue to pay them for their services.

105.     Lorinsky and First Nations' actions offended this State's public policy barring unfair and unscrupulous insurance practices.

106.     Lorinsky and First Nations have engaged in business conduct that is immoral, unethical, or unscrupulous.

107.    Lorinsky and First Nations' actions have caused substantial injury to the Tribe, which injury was not outweighed by counterveiling benefits and which injury the Tribe could not reasonably have avoided.

108.    The Tribe has suffered an ascertainable loss.

109.    Lorinsky and First Nations's actions violated the Connecticut Unfair Insurance Practices Act,  Conn. Gen. Stat. §§ 38a-815 et seq., and the Connecticut Unfair Trade Practices Act § 42-110a et seq.

## DEMAND FOR RELIEF

On Counts One and Four:

     1.     Damages;

     2.     Interest;

     3.     Punitive damages;

     4.     Costs; and

     5.     Such other and further relief as the Court deems appropriate.

On Counts Two, Three, Five and Six:

     1.     Damages;

     2.     Interest;

     3.     Costs; and

     4.     Such other and further relief as the Court deems appropriate.

On Count Seven:

     1.     Damages;

     2.     Punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

     3.     Attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g(d).

     4.     Interest;

     5.     Costs; and

6.      Such other and further relief as the Court deems appropriate.

PLAINTIFF – VIEJAS BAND OF KUMEYAAY INDIANS


By_____
    Elizabeth J. Stewart - #ct01316
    Theresa M. Parietti - #ct23559

Murtha Cullina LLP
Whitney Grove Square
Two Whitney Avenue, P.O. Box 704
New Haven, Connecticut 06503-0704
Telephone:  (203) 772-7700
Facsimile:  (203) 772-7723
estewart@murthalaw.com
tparietti@murthalaw.com